## CONCRETE MIXING & CONVEYING CO. v. ULEN CONTRACTING CORPORATION et al.

(District Court, S. D. New York. August 4, 1925.)

Patents ⪜328—McMichael patent, No. 1,127,-660, claims 2, 4, 6, 17, 21, 22, 28, 34, and 35, covering method and apparatus for transporting concrete through pipe by pneumatic pressure, held valid and infringed.

McMichael patent, No. 1,127,660, claims 2, 4, 6, 17, 21, 22, 28, 34, and 35, covering method and apparatus for elevating and transporting concrete through a pipe by pneumatic pressure, *held* valid and infringed.

Affirmed in 12 F.(2d) 931.

Stephen J. Cox, of New York City (Stephen J. Cox, of New York City, and A. G. McCaleb, of Chicago, Ill., of counsel), for complainant.

James L. Steuart, of New York City, for defendant Ulen Contracting Corporation.

Frank S. Moore, of New York City (James L. Steuart, of New York City, of counsel), for defendant Shandaken Tunnel Corporation.

12 F.(2d)—59

AUGUSTUS N. HAND, District Judge. This is a suit for infringement of United States letters patent No. 1,127,660 to John H. McMichael, granted February 9, 1915, claims 2, 4, 6, 17, 21, 22, 28, 34, and 35.

The invention has for its object to provide a method of and an apparatus for elevating and transporting concrete. The patentee describes concrete in the specification as "a composition containing relatively large pieces of rock or stone as uniform in size as possible, together with predetermined proportions of sand, cement, and water." Pneumatic pressure is used to compress the concrete into a restricted conduit pipe, and then additional pressure by means of a jet of compressed air is applied to the mass near the entrance of the conduit pipe, thereby pushing the mass into and along the conduit.

The McMichael invention is a most interesting one, and has apparently met with general acceptance. Engineers at first distrusted the possibility of lifting and conveying concrete large distances by the McMichael device. The very material would be likely to clog any long pipe line. Moreover, the weight would be so great, if conveyed as a mass by means of pressure from the rear, that too great pressure for safety would be required, if, indeed, enough could be applied, where the distance was long, and concrete, as in some cases, was lifted 80 feet. Various attempts to convey sand appear in a number of patents, and in the Goldie patent, No. 707,840, sand was ejected under railroad ties by steam pressure.

In the Farnham patent, No. 747,396, there was a sand blast apparatus shown, where the sand was carried into the discharge pipe by gravity, aided by compressed air, and then ejected by an air blast nozzle entering the discharge pipe in the general direction thereof. The patent to Sticker, No. 758,118, is likewise for a sand blast.

None of these patents, in my opinion, would teach any one with imagination and talents short of a real inventive faculty to install a conveyer which would obviate the delay and expense of laying concrete by hand about the forms on which a tunnel is built. They were kinetic devices for floating light material. This was in substance so, even in case of the Goldie patent, where dry cement, or cement mixed with sand or gravel, was ejected from a short hose by an air or steam water blast. It is not accomplished by a heavy air pressure, as in the patent in suit, but by air or steam velocity.

In the McMichael patent, the second blast of compressed air at once cuts the concrete

mass and shoves along the segment of concrete. The segment to be shoved along is of comparatively small weight and dimension, so that it can be carried without clogging the discharge pipe. Mr. Kirkland, the chief engineer of the complainant, described this at page 9 of the record:

"Q. 42. What is the effect, as you have observed the operation of the machine, of working the jet at the bottom directed at a line or an angle to the travel of the material in passing from the main vessel? A. The air breaks up or penetrates the mass as it goes toward the outlet, detaching portions of it, so that these portions will present a surface to the oncoming booster jet, so that they may be forced through the pipe.

"Q. 43. And are these batches solid, or in detached portions? A. They come on in waves. Sometimes the successive portions of each batch follow each other so rapidly through the pipe that to the casual observer it would be almost impossible to tell whether it was a continuous stream or successive batches; but in long pipe lines the successive batches are more pronounced, and one observing them will note a wave—that the material comes in waves.

"Q. 44. How far has concrete been conveyed and placed in this apparatus from the apparatus itself? A. On the Twin Peaks tunnel, in San Francisco, we placed it at a distance of 4,900 feet from the machine."

Mr. Batemen, the superintendent of the well-known contractors, Booth & Flinn, confirmed the foregoing testimony as to the discharge of the concrete from the complainant's machine in sections.

Complainant's expert, Frederick Ray, said:

"The net result of that is that it is possible to handle this concrete in slugs through a long pipe with a comparatively low pressure of air—that is, a pressure of air around 100 pounds; whereas to force it as a continuous stream through such a pipe might take thousands of pounds, or it might even be impossible, but certainly concrete can be forced through a certain length of pipe." Minutes, p. 91.

Mr. Ray points out the portion of the specification which indicates that the inventor understood these advantages of his invention. McMichael says, at page 2, lines 45 to 100, of the specification:

"It will be observed that the upper air pipe 8 serves merely to supply air to the upper part of the chamber 1, the pressure of the air being uniformly applied over the entire upper surface of the mass. The lower pipe 10, however, serves to direct a jet of air moving at a considerable velocity directly against portions of the mass as they move toward and into the discharge duct. The two pipes thus act in very different ways; the upper pipe supplying air which acts by pressure, and the lower pipe supplying air which acts by velocity. On account of the presence of large and small particles, and on account of the presence of water, a mass of concrete forming materials (whether completely mixed or not) is relatively compact and impervious to air, and on this account the upper air body acts by applying a uniform pressure to the entire upper mass surface, and without any substantial penetration of the air itself to the interior of the mass. Air from the lower pipe 10 may force itself into the body of the mass, and the relatively small air jet, acting upon the relatively large stream of outward moving materials, directly engages with the submasses to push them along. This action of the two air bodies in my apparatus is to be contrasted with the action of air in earlier devices, which were so constructed that light materials, such as grain or ashes, could be caught in large moving air bodies and carried along in suspension, with each particle separated from the others. One of the strongly marked and novel matters incident to this provision of the pipe 10 for introducing air directly into the discharge pipe, whether considered by itself or considered as supplemental to the agency, such as the air from pipe 8 tending to effect downward and forward propulsion of the entire mass, is this: That the rapidly moving air from pipe 10 acts upon submasses, successively, of the general mass, at points near those where they enter the delivery pipe, the result being that the thorough commingling of the ingredients (rock pieces, sand, cement, and water), well understood by the engineer to be essential to a perfect concrete, can be attained with great rapidity and with a perfect, uniform, distribution of the various ingredients as concerns the relative positions of all the component particles."

A device for transporting sand, ashes, or coal, even, by means of an apparatus having a structural resemblance to complainant's device nearer than we find, furnishes no anticipation of the patent, and McMichael's conveyor, when applied to concrete, is not objectionable as a double use. Concrete Appliances Co. v. Meinken (C. C. A.) 262 F. at page 964. As Judge Denison remarked in the foregoing case: "Certainly, the art of loading coal into a ship for fuel is not the same art as that of distributing wet concrete

to a building structure; nor is the analogy very close." See, also, Hobbs v. Beach, 180 U. S. at page 389, 21 S. Ct. 409, 45 L. Ed. 586.

The appreciation by the inventor of the necessity of limiting the concrete to be conveyed to sections of moderate size and weight, and his method by the second air jet of securing the cutting off of a segment from the mass of concrete and a propulsion of this segment through the discharge pipe, involves invention of a high order. His device has displaced all other methods for rapidly and economically conveying, lifting, and placing concrete at long distances from the initial source of supply, and has been used in numerous great enterprises. In such circumstances, his claims should be read broadly, and given a fair range of equivalents. When so read, I think the defendants plainly infringe.

The process claims are limited to no particular form of apparatus, so that the contention that they are for a mere function seems without merit. Expanded Metal Co. v. Bradford, 214 U. S. 366, 29 S. Ct. 652, 53 L. Ed. 1034; Buffalo Forge Co. v. City of Buffalo, 255 F. 83, 166 C. C. A. 411.

I find claims 2, 4, 6, 17, 21, 22, 28, 34, and 35 valid and infringed, and grant an interlocutory decree to the complainant, with the usual reference.