## CONCRETE MIXING & CONVEYING CO. v. R. C. STORRIE & CO.

District Court, W. D. Washington, N. D. November 12, 1927.

No. 394.

Patents ⟷328—McMichael, 1,127,660, claims 1, 2, 17, 18, 24, 29, 34, and 35, for apparatus conveying concrete, held void for want of novelty and invention.

McMichael patent, No. 1,127,660, claims 1, 2, 17, 18, 24, 29, 34, and 35, for method and apparatus for discharging and conveying concrete from a container by use of compressed air, *held* void for want of novelty and invention.

In Equity. Suit by the Concrete Mixing & Conveying Company against R. C. Storrie & Co. Decree for defendant.

Lynn A. Williams, Clifford C. Bradbury, and Albert G. McCaleb, all of Chicago, Ill., and Battle, Hulbert & Helsell, of Seattle, Wash., for plaintiff.

Charles E. Townsend, of San Francisco, Cal. (S. F. Chadwick, of Seattle, Wash., and William A. Loftus, of San Francisco, Cal., of counsel), for defendant.

BOURQUIN, District Judge. This infringement suit involves claims 1, 2, 17, 18, 24, 29, 34, and 35 of McMichael's patent 1,127,660, granted February 9, 1915, on application filed January 14, 1907. The usual defenses are interposed.

The answer alleges there are 10,000 patents in the art, cites 100, and there are an extraordinary number of references. For this, palliation is attempted by semiapologetic "inability to forecast how they may be judged by the court," which may be taken as a courteous expression of doubt of the court's comprehension, or of fond hope that it may be deluded. Of the claims in suit, 2, 17, 34, and 35 were held valid in Concrete, etc., Co. v. Corp. (D. C.) 12 F.(2d) 929, Id. (C. C. A.) 12 F.(2d) 931. The record of that case differs from this at bar.

In the beginning McMichael's application was limited to "improvements in apparatus for transporting granular and plastic building material, such as sand, plaster, mortar, and concrete." Then, as now, the apparatus consisted of an upright cylindrical container, with hopper bottom terminating in a discharge pipe to the hopper connected by a U-bend. Two separately controlled air pipes connected with the container; one at the top, the other near the bottom and pointing downward. The specification in description of function and operation stated that air "under any desired pressure," admitted through the

upper pipe and over the material, by its pressure would force the latter downward and through the discharge pipe; that as the material passed through the U-bend it would be more or less tightly packed, which would tend to "hold the water and the *granular* material with which it is mixed intact, so that the tendency to blow the water out of the material is eliminated"; that "to loosen the material at the lower end of the hopper, should the same become packed, I provide the additional air pipe adapted to discharge air through the material."

Of six claims, one only related to the lower air and as follows: "An air pipe to deliver air at the lower end of the hopper, substantially as described." McMichael's prosecution of the application was dilatory to the limit of time, once incurring forfeiture. After more than two years, interference was declared with Leake. The latter's application had been filed October 7, 1907, and was for "improvements in a cement mixing and distributing system * * * for preparing a concrete mixture and delivering it." Leake's apparatus contained all of McMichael's, and more, but without the U-bend. Its air pipes were of single control, and that for the lower air terminated in three nozzles opposed in one plane. In function and operation Leake's specification stated that the upper air would force the concrete down past the said nozzles, "where it can be detached in portions and blown" into and through the discharge pipe.

Several of his claims were variations of this following, viz.: "The method of conducting plastic material through a closed conduit, which consists in introducing the plastic material in a mass in a chamber connected to said conduit, introducing relatively compressed air behind the whole mass and behind a front portion thereof, and thereby detaching successive portions and driving them from the chamber into the conduit and along the latter."

For the purposes of interference, to McMichael the Commissioner suggested four claims, including the claim aforesaid verbatim from Leake, which McMichael promptly accepted as substitutes for his six, thereupon canceled by him. The interference was not concluded, for that plaintiff became assignee of both applications. Ultimately patents were granted for both, Leake's, 1,215,558, upon February 13, 1917; but, whereas McMichael's contains the aforesaid claim verbatim from Leake and several like, but of some difference, in phraseology, Leake's, curiously enough, changed the form theretofore

his own, but retained the substance. In the meantime Bliss, of Washington, had become attorney for both applications, and January 24, 1911, and later in behalf of McMichael, he filed very extensive amendments of specification and claims, increasing the latter to 35.

In the course of these proceedings in McMichael (to which the comment in Greenwalt's Case [D. C.] 3 F.[2d] 660, is applicable), the invention is expanded to include method, as well as apparatus, and by exclusion is restricted to only concrete. Although the amended specification included the function originally ascribed to the lower air as aforesaid, it also declared that McMichael had "found" that the lower air is "very effective in aiding the passage of the material into and through" the discharge pipe; that, "in cases where the friction" by the mass driven down by the upper air "is serious," the lower air "gives to the material the velocity which is needed to carry it to the remote point of delivery"; that it "acts upon the submasses successively, * * * the result being thorough commingling of the ingredients," for that "the delivery pipe itself becomes a mixing chamber," but therein "the components are not driven apart or carried to different distances because of differences in specific gravity."

The amendments so far ignore the U-bend, so prominent in the original application and claimed eo nomine, that its function in respect to granular material in the original claimed is eliminated, along with all reference to granular material itself, and in only two or more claims of the patent is it indicated by the statement that the discharge pipe is "provided with a bend," without any function or effect ascribed to it, save that "the material will be more or less tightly packed as it is directed therethrough." The latter, standing alone, is not beneficial, and, because detrimental, the U-bend in practice is no longer used or incorporated in the apparatus.

The amended specification also stated that the upper air is the primary force, the pressure of which "compels the entire mass to escape into the pipe with great rapidity and force," thence assisted in discharge by the lower air. In practice, the air pressure is maintained at 100 pounds, and the container holds about two cubic yards or less of concrete. The claims in issue are for apparatus and method in their various elements.

The charge of infringement against defendants is predicated upon their use of Hackley's apparatus, patent 1,619,297 of 1927. This latter is an oblong container, ovoid in cross-section, without upper air

pipes, but having four lower air pipes. The discharge pipe is at the bottom and one end, and the disposition of the lower air pipes is entrance at the bottom, pointing towards the discharge pipe, one opening into the entrance of the latter, one opening into the opposite end of the container, and between them open the other two and equalizing the distances between all of them in order. In operation the container filled, the air is first admitted through the pipe opening in the entrance to the discharge pipe, and thereafter through the others progressively to the rear as the concrete subsiding in front of them is driven out through the discharge pipe.

Plaintiff's contentions as they appear in its brief are that McMichael invented (1) the hopper-bottomed container; (2) application of compressed air to convey concrete; and (3) the method of the lower air to detach portions of the concrete, which alternating with like slugs of air, are driven through the discharge pipe.

In respect to the first, containers with hopper bottoms to direct the flow of their contents preceded McMichael for time so long, the memory of man runneth not to the contrary.

In respect to the second, long prior to McMichael were many devices more or less like his, in which the art of compressed air to convey mobile substances was developed and used. Whether or not it had yet been applied to concrete, to the latter is but a new and analogous use, devoid of novelty or invention. The affinity and analogy of concrete to other mobile substances, commonly thus conveyed, was recognized by McMichael himself in his association of it with sand and other granular materials in his original application. His subsequent exclusion of all but concrete of those so associated is suggestive of preparation for litigation to come. To extend the art to concrete when it came into extensive use, not invention, but only common sense, to say nothing of ordinary mechanical skill to be expected in the progress of the art, was required. In principle, it differs none from like extension of the use of a wheelbarrow to convey concrete. For a principle, appliance and method, applied to substances in general, will naturally embrace any new substance, even as a statute relating to a genus will open to include newly created species.

The instant case cannot be distinguished in principle from Concrete, etc., Co. v. Gomery, 269 U. S. 177, 46 S. Ct. 42, 70 L. Ed. 222, wherein it is held that appliances and method of conveying mobile substances by gravity extended to concrete when it came into use, and a subsequent patent to thus convey concrete is invalid. For gravity, substitute compressed air, and that case "reads on" this.

Moreover, prior to McMichael were patents for appliances and methods to convey concrete by the agency of compressed air. Amongst these are Smith, 122,498 of 1872, Cannif, 873,345 of 1906, and McIlvrid, 958,-421 of 1905. In so far as it is argued that some of these are for grout, and will not function with less liquid concrete, the answer is they can be used for any practical flowable concrete, and they have been. They are of the simplicity of McMichael's, and even average intelligence will perceive their ability to operate successfully.

The variety of concrete is not material, save in respect to the mere incidentals of pressure and size of container, load, and discharge conduit. In any apparatus, including McMichael, the concrete must be flowable in quality, and the pressure in due proportion to the weight and friction of the load ahead of it. To suit these incidentals to circumstances is mechanical, and not invention. And this is true, be the container capacity or load discharged in one slug (continuous stream) or in several shorter slugs.

Adverting to the third of plaintiff's contentions, the first observation is that the slug theory is not proven and is untenable. With 100 pounds of air from the primary upper air pipe behind it, the concrete stands not on the order of its going, but goes at once, and through the discharge pipe "with great rapidity and speed." In these circumstances, the upper air does not halt until the lower air has neatly cut off and removed a slug of concrete, nor does the lower air, of like pressure from the common reservoir, halt until within the field of its activity has been projected sufficient concrete to form any slug.

In the nature of things, the patent now stipulating what the application originally did not, viz. simultaneous and constant application of both upper and lower air, the lower air can but some disintegrate and aerate the mass of concrete as it rushes by, and thereby lubricate, lighten, and assist its flow through the conduit. The lower air but joins and flows in the same direction and with the stream of concrete. It may be that, if the upper and lower air were alternately applied, some quasi slug action would follow, akin to the action of Sounders' "air-lift pump," patent 597,023 of 1896, but not when simultaneously applied as here.

Taking McMichael as it is, to expect or secure movement of the concrete in alternate slugs of concrete and air would do violence to the laws of nature and confound reason. It cannot be done. Moreover, the proof is clear, by plaintiff's witness as by defendant's, and some who are interested in plaintiff, that the concrete discharges in a continuous aerated or mixed stream of concrete and air, and not at all in any slug formation.

As between Wilkin's test, discrediting the slug theory, and Ray's, supporting it, the former's is calculated to more nearly approach accuracy. Evidently McMichael "found" the basis of the slug theory in Leake, and his claim aforesaid by the Commissioner presented to and adopted by McMichael. Until then McMichael did not suggest that the lower air had any such function or result; until then, he limited the lower air in some undefined volume and pressure to only some time use if the material chanced to pack in the hopper, to blow through the material and loosen it, in function, object, and result, nothing but a convenient substitute for a crowbar.

To thereafter broaden his claims, to embrace the idea and method of Leake, avails McMichael nothing. See Hobbs v. Beach, 180 U. S. 396, 21 S. Ct. 409, 45 L. Ed. 586. The impression irresistably created by the facts is that, after knowledge of Leake, all McMichael's amendments were to include Leake's idea and method, and to exclude from McMichael's original application all possible that was inconsistent therewith. Be that as it may, that in McMichael as in Leake the lower air serves a useful purpose clearly appears; but, as between them, in its present aspect in McMichael it is the idea and method of Leake, and not McMichael, in that, prior to McMichael, Leake had conceived the idea, and in 1905 in New Orleans had publicly and successfully employed it in concrete building operations.

For, despite Leake's reluctance to testify against his assignee, the plaintiff, the evidence in quality and quantity inspires confidence and constrains conviction of the truth of the fact and beyond reasonable doubt. Neither of them, however, is inventor of the thing. Before them, it was old in the art.

Amongst many patents asserted to be anticipatory of the idea and use of the lower air, but three need be considered. Of these, the first and second are Duckham's English patents 4,400 of 1875, and 15,348 of 1885. They are for apparatus and method to convey the spoil or mud excavated in dredging. To that end are employed a container for the material, compressed air above or behind it to drive it down to and through the discharge pipe, and like air through several nozzles in the bottom and pointing towards the discharge pipe, "to keep the mud agitated and prevent any thick deposit in the tank."

The third is Kolsche's German patent, 18,394 of 1882, for "apparatus for conveying substances, slack, sandy, or granular material, by means of a current of air." The apparatus is like McMichael's, without the U-bend; that is, it is an upright cylindrical container, with hopper bottom terminating in a discharge pipe. Compressed air is applied above or behind the material in the container, to force it down and into the discharge pipe, and at that point like air is admitted to assist in driving the material through the pipe.

Without any change, perhaps, save adjustments to circumstances as always, Kolsche's apparatus and method will transport concrete as does McMichael's. Kolsche could rightfully devote it to that analogous use. It follows that McMichael's essentially unchanged application of Kolsche to analogous materials and uses, is not invention. In principle, essential design, function, operation, object, and result, Kolsche and McMichael are one and the same. Either reads on the other. Kolsche, if later and devoted to concrete, might infringe McMichael, and by the same token, being earlier, he anticipates him.

The same is true of Duckham, especially in respect to McMichael's application originally, and their common use of the lower air to prevent or relieve packing of the material. It must be remembered that the test of "analogous uses" is not from whence comes and where goes the materials, to what ultimate end or use, or their nature, but is the *method* of conveyance. Although fertilizer and flour be unlike, and for ends as wide apart as the poles, a wheelbarrow conveying both is devoted to analogous uses, in patent law.

In so far as the third contention counts upon nonseparation of the components in the discharge pipe, this result is imputed to nonexistent slug action, and is inconsistent with the claim that the ingredients continue in active mixation throughout the pipe. But note that in the original application this function of the U-bend was in relation to *granular* material only, and, with the latter's elimination from the patent, the function was likewise eliminated. It may be added that the nonseparation of components of *plastic* materials is due to that mutual cohesiveness

which granular materials do not possess. All the elements of McMichael are old. It does not appear that he discovered, invented, combined, or made anything new.

That serves to dispose of the case, and the defense of noninfringement needs no more consideration than to note that Hackley's apparatus is a different combination than McMichael's, has no upright cylindrical hopper bottomed container, is without the U-bend, employs no upper air, save some incidental back pressure, does not discharge slug fashion, as claimed is the invention of McMichael, and so does not infringe. Likewise of the defense of insufficient supplemental oath to McMichael. It is noted that this was required by the Commissioner, February 18, 1911, was supplied by Bliss, February 17, 1912, purports to have been executed by McMichael, of Toledo, before Bliss, Jr., in Chicago, March 6, 1911, discloses in some lettering and spelling of McMichael's signature, striking differences from his signature to his application, applies to only part of the claims, and that McMichael some time died.

The finding and conclusion are that the claims in suit are void for want of novelty and invention.

Decree accordingly.