## CONCRETE MIXING & CONVEYING CO. v. R. C. STORRIE & CO.*

Circuit Court of Appeals, Ninth Circuit.
August 20, 1928.

No. 5425.

1. Patents ⬡⟶328—No. 1,127,660, claims 1, 2, 17, 18, 24, 29, 35, for method and apparatus for transporting and treating concrete, held invalid for anticipation, and not infringed.

McMichael patent, No. 1,127,660, claims 1, 2, 17, 18, 24, 29, and 35, for method and apparatus for transporting and treating concrete, *held* invalid for anticipation by Smith patent, No. 122,498, English Duckham patents, 4,400 and 15,348, and application assigned to patentee, and not infringed by devise described in Hackley patent, No. 1,619,297.

2. Patents ⬡⟶53—That patentee of device for discharging mud from dredges was working with easily flowing material is unimportant on question of anticipation of device for transporting concrete.

That patentee of improvements for discharging mud from dredges was working with material which flows with facility is of no importance on question of anticipation of subsequent patent on method and apparatus for transporting and treating concrete.

In Error to the District Court of the United States for the Northern Division of the Western District of Washington; George M. Bourquin, Judge.

Suit by the Concrete Mixing & Conveying Company against R. C. Storrie & Co. Decree for defendant (23 F.[2d] 131), and plaintiff brings error. Affirmed.

The appellant brought a suit, alleging infringement of claims 1, 2, 17, 18, 24, 29, and 35 of patent No. 1,127,660, issued February 9, 1915, to John H. McMichael, assignor, for a "method of, and an apparatus for, transporting and treating concrete." The application was filed January 14, 1907, and was pending in the Patent Office more than 8 years. As originally filed, the application was for "improvements in apparatus for transporting granular and plastic building material, such as sand, plaster, mortar, and concrete." The apparatus as patented consists of a vertical closed cylinder, tapering toward the base to discharge into a U-bend connected with a conduit having an air nozzle at the top of the cylinder and an air nozzle near the entrance to the U-bend, each separately controlled, under pressure of which the concrete material in the chamber is forced through the conduit and carried to the point where it is to be deposited. It was claimed that the appellee infringed by use of the device described in letters patent No. 1,619,297, issued March 1, 1927, to Roy C. Hackley,

*Rehearing denied October 1, 1928.

for a "concrete gun," which consists of a horizontally disposed oblong tank, ovoid in cross-section, with the narrow portion disposed downwardly, and with a tapering nozzle, to which is connected a discharge pipe for conveying the concrete. Air pressure is furnished by four air supply pipes, extending within and along the bottom of the container, and terminating at different points intermediate the ends of the tank. Into the pipe which terminates nearest the exit the air is first admitted, and thereafter into the others in their order, until all the concrete is driven into the discharge pipe. In the specifications it is said that the pipe which terminates near the nozzle insures that pressure shall always be present there, directing the concrete into the discharge pipe, and that the remaining pipes serve to advance the body of concrete along the bottom of the tank, until the tank is completely emptied. The containers in both the appellant's and the appellee's patents are filled with concrete through openings in the top, which are then closed by air-tight lids.

At the close of the trial the court below found the appellant's patent anticipated and invalid, and that, even conceding its validity, it had not been infringed by the appellee. Concrete Mixing & Conveying Co. v. R. C. Storrie & Co., 23 F.(2d) 131.

Lynn A. Williams, Clifford C. Bradbury, and Albert G. McCaleb, all of Chicago, Ill., for appellant.

Chas. E. Townsend, of San Francisco, Cal., for appellee.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). [1] In the prior art were shown numerous patents involving the use of compressed air for conveying through pipes a wide variety of materials, such as concrete, crude oil, dredge spoil, sand, and water, grain, molten sulphur, etc. As to all prior patents the appellant insists that none is anticipatory of its combination, for that they all lack the salient feature thereof, the arch-breaking nozzle, or anything that could exercise the function thereof.

Of the prior patents we find it necessary to refer particularly to but three, the patent to Smith, No. 122,498, of January 2, 1872, and the English patents to Duckham, one No. 4,400 of 1875, and one No. 15,348 of 1885. The Smith patent was for "an improvement in the manufacture of concrete pavements and machinery for same." The

specifications described the apparatus as specially adapted to the manufacture and convection of concrete composition through pipes so as to set quickly upon reaching its destination and form a solid mass of artificial stone, and uncontradicted testimony was given of the successful use of the Smith machine in conveying concrete through a pipe by compressed air. The device contained all the features of the appellant's patent except the nozzle for admission of air near the point of exit.

The Duckham patent of 1875 was for improvements in discharging mud or soil from dredges. The mud was received in tanks capable of being closed air-tight, with the exception of inlets for the compressed air and an outlet for the spoils. In the specifications Duckham said: "I prefer to inject compressed air * * * through a number of nozzles at the bottom of the tank, said nozzles being pointed toward the outlet. By this means the particles are prohibited from settling, and are kept in suspension until the whole is expelled from the tank. Compressed air may, moreover, be admitted into the discharge pipe with the same object." We think it indisputable that Duckham, in prescribing the use of pipes for the admission of compressed air in the tank, the same distributed along the bottom of the tank, and one of them locatable at the exit, presented the use of all that is included in the appellant's combination, save and except the U-bend, an exception which is negligible so far as the present litigation is concerned, and if there is distinction in the fact that Duckham used no air pressure above the contents of the tank, and thus omitted one of the features of the appellant's combination, that feature is also absent from the Hackley combination used by the appellee.

[2] But the appellant asserts that Duckham was working with a material which would flow with facility, and that the nozzles which he used were intended for no other purpose than to stir up the mud in the bottom of the tank. It is true that Duckham was engaged in moving a material quite different from concrete, but that fact is not of importance on a question of anticipation. Concrete Appliances Co. v. Gomery, 269 U. S. 177, 46 S. Ct. 42, 70 L. Ed. 222. In his second patent of December 14, 1885, Duckham says: "The mud or spoil was received directly from the dredging buckets in a tank or tanks, whence it was expelled through outlet pipes by means of compressed air admitted at the upper part of the tank, assisted by compressed air and water injected at the bottom of the tank to agitate the mud and prevent thick deposit." And if we may refer to the engineering publication, Minutes of the Proceedings of the Institution of Civil Engineers (1887), in evidence here, we find that Duckham stated that "with clay or stiff mud, if the nozzles of the air injection pipes were too small, the compressed air, instead of driving out the material, simply pierced holes through it, escaping through the discharge pipe and carrying along with it all the liquid and thin material in the tanks. This defect was easily rectified by rearranging and increasing the size of the large injection nozzles, and the apparatus now gives most satisfactory results."

It is assigned as error that the trial court found that Leake had made the invention in issue prior to the date of McMichael's application. In the opinion of the trial court it is said: "Prior to McMichael, Leake had conceived the idea, and in 1905 in New Orleans had publicly and successfully employed it in concrete building operations, for, despite Leake's reluctance to testify against his assignee, the plaintiff, the evidence, in quality and quantity, inspires confidence and constrains conviction of the truth of the fact, and beyond reasonable doubt." The McMichael application was filed January 14, 1907, and nine months later on October 7, 1907, was filed Leake's application, which presents everything contained in the McMichael application with the exception of the U-bend. Leake said: "The object of my invention is to provide a method and apparatus for preparing a concrete mixture and delivering it while in a plastic condition to the place where it is to be utilized. Another object of my invention is to move plastic concrete from one place to another by means of air pressure."

On May 12, 1909, interference was declared between McMichael and Leake and Wm. W. Darley, who had applied for a patent on "apparatus for handling ashes and other materials." Leake and Darley each filed an affidavit setting forth their respective dates of conception and reduction to practice. Darley was dismissed from the interference, as being found subsequent in time to the others. Leake's affidavit stated that he "conceived the invention set forth in the declaration of interference on or about the 1st day of February, 1905; that he first made drawings of the invention on or about the 1st day of March, 1905, and first explained the invention to others on or about the 1st day of June, 1905; that he first embodied his invention in a full-sized machine which

was completed on or about the 1st day of September, 1905, and that on or about the 1st day of September, 1905, the said machine was first successfully operated in the city of New Orleans, and state of Louisiana, and that he has since made and used other machines embodying the same invention." Before the interference was declared, it was represented on behalf of Leake's application that he had done a large amount of experimental work in connection with his invention. "He has successfully moved concrete from the place where it is mixed to the place where it is to be used, by means of air pressure, using the apparatus disclosed in his application." Again it was said: "He has given considerable time and thought to this matter, and has actually constructed several plants where this is done. Their operation is highly successful, and appears to be a decided improvement over previously known methods for handling plastic concrete."

But no showing was made or evidence offered to carry the McMichael invention farther back than the date of his application, nor was any proceeding had in the Patent Office upon his application until 19 months thereafter, when for a consideration of $6,000 Leake assigned his application to McMichael's attorney, who later assigned it to the appellant, which had become also the owner of the McMichael application. The long period of inaction and silence on the part of McMichael, unexplained as it is, together with the payment to Leake of so large a sum of money as $6,000, payable as it was in annual installments until March 1, 1920, is strongly suggestive of the inference that McMichael recognized the priority of Leake's invention and could furnish no proof to the contrary. As a witness for the appellee in the court below, Leake testified that he conceived the idea of moving concrete, as set forth in his application, about February 1, 1905; that he made a container in which to put the concrete, and by the means of an air pipe extending therefrom shot it up on top of a power house then being constructed in New Orleans; that, when the air pressure was applied, the concrete all went up and landed on there; that later he built a commercial apparatus in Chicago and operated it in conveying dry cinders to the fifth floor of a building. His testimony, together with his preliminary statement, carried the date of his invention back of that of McMichael and showed an actual reduction to practice by Leake as early as 1905.

We find no ground for disturbing the trial court's conclusion. The question at issue was which of two applicants for patent was the inventor. Both presented drawings and plans of the same invention. Leake furnished evidence of the time, place, and circumstances of the reduction of his invention to practice. There was no denial of the truth of his testimony. In Armstrong v. De Forest Radio Telephone & Tel. Co. (C. C. A.) 280 F. 584, 590, it was said: "While it is true that uncorroborated testimony of an inventor is to be accepted with caution, * * * yet there is no rule of law that requires the rejection of the uncorroborated testimony of an inventor as to the date of its conception. The court must be satisfied as to the fact of demonstration and that the conception was complete." In Reed v. Cutter, Fed. Cas. No. 11,645, 1 Story, 590, 596, Mr. Justice Story said: "If the invention is perfected, and put into actual use by the first and original inventor, it is of no consequence, whether the invention is extensively known or used, or whether the knowledge or use thereof is limited to a few persons, or even to the first inventor himself."

So in C. F. Mueller Co. v. A. Zeregas Sons (C. C. A.) 12 F.(2d) 517, 518, considering the question which of two was the real inventor, Judge Hough said: "The question of invention as between Mueller and Wild is really only one of veracity. There are no presumptions or artificial rules regulating such an investigation, and the evidence of one witness may be sufficient"—citing James E. Tompkins v. N. Y. Woven Wire, etc., Co. (C. C. A.) 159 F. 133. That the testimony of one witness may be sufficient in such a case is held in Mayer v. A. & H. G. Mutschler (C. C. A.) 248 F. 911, 914, where it was said that one witness may suffice, if the surrounding circumstances are confirmatory.

But it is insisted that neither Leake's combination nor that of Duckham can operate successfully, as does that of the appellant, to convey concrete and pack it at the place where delivered more effectively than could be done by hand tamping, a result which it is said is accomplished by the appellant's delivery of the concrete with velocity and momentum in successive slugs or parcels. The trial judge held that the slug theory is not proven and is untenable, and said: "It may be that if the upper and lower air were alternately applied, some quasi slug action will follow, akin to the action of Saunders air lid pump, patent 597,423 of 1896, but not when simultaneously applied, as here." There was no suggestion of a slug theory in the original application of McMichael, but when the patent was issued, more than eight years later, it was stated in the specifications that the lower air pipe adjacent to the dis-

charge duct "serves the double function of preventing choking in the entrance to the delivery pipe and of supplying air under pressure in sharp jets directly to the delivery pipe itself."

The slug theory was obviously adopted, from expressions found in Leake's application, in which he proposed the use of a combination consisting of two tanks discharging into a single conduit alternately, by means of which the main body of concrete "can be detached in portions and blown into the conduit and driven along the same." Such a result might be accomplished by the use of his combination, but it is not apparent that any slug action occurs in the use of either the McMichael or the Hackley combination. In neither is there intermittent pressure, or "sharp jets" of air, and in both there must necessarily be exerted a steady and continuous force from the upper and the lower air nozzles, combining to drive forward the concrete and deliver it in a practically unbroken stream, and if, indeed, a temporary obstruction of material at the exit should occur, it is not believed that its release would result in a slug action, or a constantly intermittent propulsion of concrete, or that, if such an intermittent action could in practice be accomplished, any advantage would thereby be attained. The decided weight of the testimony is to the contrary.

It is stated in the brief of appellant's counsel that the appellee's engineer, Hackley, admitted that the appellant's apparatus "operates on the slug principle." We do not so understand Hackley's testimony. What he said was that the air mixes with the concrete, and as such prevents it from discharging as a solid mass, and that "the mass is broken up into portions, which are driven ahead under high velocity by the air discharging from the pipe *34*, this being of considerable importance, as it positively prevents choking or blocking up of the apparatus." Hackley was speaking only of such breaking up of the discharging column as resulted from the admixture of air and concrete in the discharge pipe. He testified to having had experience in using the appellant's combination, and that in so using it the concrete issued in a continuous stream, and that in the use of his own device the concrete came out in a continuous stream mixed with the air; that the speed of the discharge thereof could be controlled by the operation of the valves, and in use was so controlled as to make it as slow as possible, for the purpose of preventing separation of the concrete and to prevent wear on the pipes; and that

27 F.(2d)—53½

when the concrete is discharged it flows by gravity down the sides. Brock, a witness for the appellant, testified that in the Skagit tunnel the concrete, when it came out through the 8-inch discharge pipe, "flowed down gently like over both sides." And such was the testimony of all the witnesses who observed the operation of the device in the Skagit tunnel.

In fact, there is but one witness for the slug theory, Ray, a consulting engineer and patent expert. He testified, in answer to the question: "How many slugs moved in a second?" "There may be 20 or 30 come out in a second. Then there will be an elapse of a second or two, when none will pass through. Then there will generally be a group of two or more in the next quarter second. * * * It is impossible for the naked eye to detect the individual slugs of material issuing from the discharge end of the duct." Wilkins, an electrical engineer, an expert, testified on behalf of the appellee that he was familiar with the apparatus in controversy, and had made tests in its operation; that in the use thereof there were no slugs or plugs, such as Ray had testified to; that it was a continuous flow of the mixture of air and concrete, and that it issued from the discharge pipe without spurts or dumps. The court below credited the testimony of Wilkins as against Ray, and we think the court was supported by the overwhelming weight of the testimony.

We think that the slug theory, when all is said, has no bearing upon the merits of the present controversy, for, whether or not the appellant's apparatus operated to deliver concrete in slugs or sections, it is very clear that the Hackley apparatus operates in delivering a constant stream of concrete, interrupted only so far as it is interfered with by the air which accompanies it through the discharge pipe. Hackley used a horizontal tank, and in his specifications he said: "With the present apparatus the concrete does not tend to pack or bridge around the nozzle, as is the case where vertical tanks are used. The mass of concrete which any one air stream is compelled to move is relatively small and unpacked, and therefore the device operates quickly and easily, and without danger of becoming clogged." The decisions in Concrete Mixing & Conveying Co. v. Ulen Contracting Corp. (D. C.) 12 F.(2d) 929, and Concrete Mixing & Conveying Co. v. Powers-Kennedy Co. (C. C. A.) 27 F.(2d) 668, relied upon by the appellant, were based on records widely different from that in the case at bar.

The decree is affirmed.