### H. WARD LEONARD, Inc., v. MAXWELL MOTOR SALES CO.

(District Court, S. D. New York. July 11, 1917.)

1. Patents ⬚178—Inventor entitled to reasonable range of equivalents.
   Mechanical means for the control of generator speed and control of field magnet strength in electrical apparatus for lighting, starting, ignition, and other purposes in gasoline motor cars *held* equivalents.

2. Patents ⬚73—Date of invention determinative of prior art.
   To ascertain what is prior art in determining anticipation, the date of the invention must be ascertained.

3. Patents ⬚328—Leonard patent, 1,122,774, held infringed.
   Leonard patent, No. 1,122,774, for a regulator to prevent overcharge of storage battery, *held* infringed.

4. Patents ⬚328—Leonard patent, 1,157,011, held infringed.
   Leonard patent, No. 1,157,011, for regulator to prevent overcharge of storage battery, *held* infringed.

5. Patents ⬚165—Applicant not limited to build claims on actual invention.
   An applicant for a patent is not limited in his right to build claims on his actual invention, and to keep on building them, as his own comprehension grows on him, provided that he first and in his original application described his achievement in terms justifying his largest ultimate claims.

6. Patents ⬚120—Mechanical and method patents on same state of facts not objectionable.
   While there may be no substantive difference in the disclosures of two patents, there is no legal objection to a man's getting both a mechanical and method patent on the same state of facts, where such issue was insisted on by the Patent Office, against the wishes of the applicant, who desired but one patent.

⬚For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit for injunction by H. Ward Leonard, Inc., against the Maxwell Motor Sales Company, to restrain the infringement of certain patents and for an accounting. Decree for plaintiff.

Decree reversed, 252 Fed. 584, 164 C. C. A. 500.

Final hearing in equity. Action on patents No. 1,157,011, claims 1, 4–10, 12, and No. 1,122,774, claims 2–4, 9–11, 16, 21, 22, 24. These patents are based upon one application, filed January 18, 1910. A division was made April 16, 1913. From the original application there resulted No. 1,157,011, for "electric apparatus for motor vehicles," which will be hereinafter called the "apparatus patent." The divisional application yielded No. 1,122,774, for a "method of controlling electric energy." This will be referred to as the "method patent."

The patentee was H. Ward Leonard, who died before suit was brought, and was a well-known electrical engineer. Plaintiff owns the patents by assignment from his personal representative. The utility and commercial success of the device made and sold by plaintiff's licensees, as embodying both the patents in suit, is undoubted and amply proven. It is used in producing from an engine-driven generator, an electrical current which loads a storage battery and thus affords means for lighting, starting, ignition, etc., in the gasoline motor car of to-day.

The defendant's device, in two forms, viz. the 1915 system, and that of 1916, does the same things, has been applied to the Maxwell car, and sold and used in this district.

The issues raised in litigation, while all reducible to the points of invalidity and noninfringement, are presented in a somewhat unusual manner. The testimony (in the main), so far as it related to facts from which anticipation might be inferred, was taken by deposition at places distant from New York; but in respect of date and particulars of invention, and expert opinions as to the teachings of operation of many kinds of apparatus, the evidence was produced in open court. I attended with counsel and experts—after trial and before argument—at the New York Testing Laboratory and witnessed the method of producing oscillograms from one of the exhibits in evidence.

Clifton V. Edwards and Lawrence K. Sager, both of New York City, for plaintiff.

Drury W. Cooper and Edwin B. H. Tower, Jr., both of New York City, for defendant.

HOUGH, Circuit Judge (after stating the facts as above). It is a way of stating a part of the defense herein to say that plaintiff has put in evidence, as its commercial product, something which does not respond to the patents in suit, although purporting to be manufactured pursuant to the same. Therefore an endeavor will be made to give, in language as simple and untechnical as possible, what I conceive to be the scheme of operation of that product—in evidence as Plaintiff's Exhibit M[1]. It is called an "automatic dynamo controller." The dynamo to be controlled is in operation, or at least in revolution, whenever the engine of the motor car is working, whether connected with the running gear or not.[1] As soon as that engine arrives at the preordained speed, the dynamo begins to supply current to the storage battery, from which is to come the power for lights, etc.

But no practical battery can safely take all the current produced by or from an engine, which may in a minute or so race from an active

---

[1] This waste apparently can be minimized by such devices as the seat switch of the patent, but the point does not seem material.

power suitable for driving the car a mile in 12 minutes to one capable of a speed of a mile a minute—and then repeat or vary such performance. There is always a superabundance of power, wherefore, if (so to speak) there can be "dipped out" of the current thus potentially available, but irregularly, suddenly, and often violently generated, just enough to feed or maintain the storage battery without gassing or other damage, a desirable end will be accomplished.

To reach this end, plaintiff's commercial product assumes or presupposes a storage battery in the main circuit of the generator, which circuit is established as soon as the automatic switch closes; i. e., when the generator revolutions are sufficient to yield a voltage greater than the common voltage of the battery. Let it now be assumed as desirable to deliver to the battery an average current of say x, which may be obtained by averaging currents never greater than x+y, nor less than x—y; this last symbol, however, representing a current value sufficient to keep the automatic switch closed and the main circuit path established.

This result the machine in evidence attains by changing, not the speed, but the effective power, of the generator, by changing the field magnetic strength. Such change of field strength is accomplished by throwing into the field circuit a resistance of large comparative value as soon as the voltage appropriate to an x+y current is reached; and such interpretation of resistance is effected by an electro-magnet in the main circuits, which at x+y current, attracts an armature, which in its normal spring-determined position serves to keep out of the field circuit the resistance aforesaid. This resistance, when interposed in the field circuit, causes the current in the main circuit to diminish in value or strength; consequently the electro-magnet loses its attractive force, and the main circuit current falls to x—y, the spring overcomes the failing electro-magnet, the resistance in the field is again short-circuited, the voltage of the main rises, until again the current arrives at x+y value, when the cycle recommences.

In point of fact, a gasoline engine running at moderate speed furnishes power far more than enough to generate the requisite e. m. f.; in practice, x+y is easily exceeded, and plainly, by this method of putting in and removing from the field circuit this single high resistance, an averaged current results from a current rising and falling within predetermined limits. Furthermore, such rise and fall will theoretically occur and recur with definite periodicity, if any speed of engine and generator greater than that productive of x+y current be maintained. Practically, oscillograms show a variation in periods or pulsations, varying only between two and four per second, at speeds varying from about 3,000 to 2,000 r. p. m.

Speaking in terms of car movement, it makes no difference whether (assuming 20 miles per hour will furnish x+y) the car travels 20 miles or 50 miles per hour, or varies between those speeds every minute, the generator potential (or possibilities) are "tapped," and the "dipping out" process repeated, several times a second; the insertion and retraction of the resistance in the field fixing the limits within which that generator directly and positively serves or feeds the storage battery.

To vary the simile, the resistance is like a plug, successively inserted in and removed from a current of fluid in a pipe. The plug never varies; it resists or "plugs" just the same and just as much every time. The only regulation or control produced by it is either "on" or "off"— "in" or "out"; there is or can be no other gradation, or step by step action. This, I think, is the important fact; the simile cannot be pressed too far, for an electric flow does not behave altogether like a fluid, but as far as stated, the illustration seems apt. In plaintiff's commercial article, this result and mode of action is reached with old and well-known, and indeed simple, parts or appliances. Mere inspection makes this so clear that nothing I can say will make the matter plainer.

For purposes of comparison, let us now take up defendant's two models—those of 1915 and 1916. Of them its own counsel say: "They are in general exactly alike, except the regulators are slightly different in form." Examination of their vital parts (as shown in Plaintiff's Exhibits E and F) reveals to me no difference at all, other than a rearrangement and consolidation of the series coil, rendering possible a probably neater and more convenient placing of the automatic switch. For the purposes of this case, I think it admitted—and, if not, obvious— that they are identical. It is equally obvious that the above description of plaintiff's commercial product covers the essentials, in mechanism and operation of the 1915 and 1916 models; the same words apply without any change to both the defendant's devices.

But, if all the foregoing be true, defendant contends (as first stated) that what plaintiff's licensee makes and sells is not the controller of the apparatus patent, nor does it operate accordingly to the method of the other grant of privilege. Considering, then, the language of the specifications *as issued,* it is seen (and admitted by plaintiff) that neither specification contains any description of a control by resistance interposed in the field circuit, which is the system common to all the commercial products in evidence.

The specifications do contain elaborate and explicit descriptions (Method, p. 5, 1.5 et seq.; Apparatus, p. 5, 1.65 et seq.) of what happens when the predetermined maximum current is reached, viz. the electro-magnet energized by the series coil attracts an armature, whose movement breaks the circuit which energizes a magnetic clutch, which constitutes the sole connection of generator to engine. This control is through and on the generator speed. But each specification disclaims this or any specific means or method of exercising control, and declares that the clutch system is but an example, or one embodiment of the patentee's thought (Method, p. 6, 1.14; Apparatus, p. 2, 1.26). It is in evidence that plaintiff's licensee, after a very limited output of magnetic clutch controllers, adopted and now practices control through the field circuit.

[1] Since every inventor is entitled to a reasonable range of equivalents, this raises the question whether the method and means now commonly used by both parties are equivalent to those so elaborately described in the printed specifications. On this query, the evidence is clear to the effect that control of generator speed, and control of field

magnet strength, were prior to the patents well known and equivalent methods of regulating generator output.

This is a fact, in the sense of being an electrician's habit of thought; it is very competently sworn to, and not anywhere denied; therefore I accept it, and such acceptance compels the holding (upon the understanding of specifications and machines hereinabove set forth) that defendant's devices and that of the patents are in law identical; they differ physically only in the substitution of an equivalent. Here it may be remarked that, since infringement must consist in making, selling, or using something on which a properly interpreted claim will read, none of the claims in suit can be made to require, as any part of the invention claimed, either a magnetic clutch or any other means for control of output by varying generator speed. No more do they require control through resistance in the field. This is plainly designed, for many claims not in suit do contain such limitations.

[2] Of the suit claims 2 and 4 (Method) and 8 and 9 (Apparatus) appear to be typical and instructive. They are discreetly general on the point of exactly how fluctuations in charging current are obtained, but read directly on both plaintiff's and defendant's commercial devices. This last is true of all the claims in issue, but these above noted will serve as texts, when validity is discussed in the light of prior art. To ascertain what is *prior* art, date of invention must be ascertained. The late Mr. Leonard was a not infrequent inventor, and published several addresses on the patent system, from a technician's standpoint. His conduct in regard to this invention was that of a man keenly alive to the importance of making and keeping evidence as to the time, nature, and sequence of his inventive operations.

This evidence need not be recapitulated; it is all one way. In result, I have rarely, if ever, known anything of the sort so clearly proven as that in May, 1909, Mr. Leonard made and operated a device which, if produced to-day, would respond to every claim in suit. This was reduction to practice. In June, 1909, he had a similar device in service on his own automobile. It follows, unless the file wrapper discloses something destructive of the inference to be drawn from the foregoing, that no art subsequent to May, 1909, need be considered.

The art urged in argument as limiting, defining, or defeating the claims in issue has been referred to as—

(1) Field patent 929,752, of August 3, 1909.
(2) The Bishop-Delano system.
(3) The Apple system.
(4) The Everett-Bliss system.

1. As the date of issue of the Field patent is too late, the file wrapper thereof has been tendered as evidence, showing that Field's date of invention was, at the latest, February 14, 1908, when his application was filed. To this it is objected (a) that for this purpose the wrapper is incompetent; (b) that the patent, with or without the wrapper, discloses an inoperative device.

(a) Admitting that filing an application for patent is a reduction to practice, the application date is commonly taken as the invention date,

between conflicting inventors. This rule further presupposes that each application discloses to the skilled man an invention and the same invention, in whole or at least in part. But Leonard and Field are not conflicting inventors. Conflict is measured by claims and no suggestion is made that Field claims anything Leonard got, nor e converso; nor (in my opinion) is it possible to postulate the claims in suit on Field's disclosures, nor any of Field's claims on those of Leonard.

Consequently the legal question is not whether Field invented and claimed something Leonard's assignee is suing on, but whether anything that Field knew and had permitted to be made known in May, 1909, was something in the presumed light of which Leonard acted in the month named; or, in other words, whether in that month Field had added anything to the sum of human knowledge. Clearly he had not done this, for his pending application was a private communication to the Commissioner. Therefore the file wrapper was not competent, for the purpose announced. On authority, I think the foregoing consistent with Sundh Co. v. Interborough Co., 198 Fed. 94, 117 C. C. A. 280; Vacuum Co. v. Dunn, 209 Fed. 219, 126 C. C. A. 313, and cases there cited.

(b) Whether Field's suggested apparatus is operative seems immaterial, if the foregoing point of law is good. As much contest has occurred about it, however, I express opinion for what it may be worth. The proposition is one, which is probably not to be absolutely resolved without experiment, such is the original sin of all electrical apparatus. Mr. Bentley deposed that the regulator in Field's drawings was inoperative, and gave comprehensible reasons therefor; Dr. Sheldon said he saw no reason why it would not work, and stopped there; yet I have now before me written arguments to show why it could work, and like enough this is what Dr. Sheldon would have said had he been asked, but then he would have been cross-examined, which is now impossible, and leaves the record in such shape that, as matter of procedure I am justified in saying that (unless the usual presumption be evidence) all the evidence is against operativeness. Perhaps this is too technical, so I have considered all the papers, including the file wrapper. In my opinion (such as it is) the skilled man of 1909 could not have made anything useful out of Field's disclosures.

It can be seen in 1917, in the light of plaintiff's and defendant's devices, and several other mechanisms, that Field had an idea of regulation or control by a vibratory member, which alternately made and broke the circuit which fed his storage battery. He shows a sort of compounded switch *(13, 2, 3)* which is at once the usual automatic *(13, 2)* and an intended regulator or control member *(3)*. When the automatic closed, the charging current was established, then I think he expected that strong current so to energize the magnet $h$ as to produce a further contact between *2* and *3*, at predetermined strength; but he says plainly that the relative windings of the two legs of $h$ are such that very little current will then flow through the field coils $j$ and $k$. This does seem to me to mean that he had put into the field so large a resistance that, the moment the automatic switch closes, the generator

output is choked off; at all events, this is what a competent electrician finds as at least the probable disclosure.

But if *13*, *2*, and *3* ever do all contact at a moment of maximum predetermined strength, then the "depolarizing coils" *5* and *6* are relied upon to enable the cycle to recommence. On this point the file wrapper is in a sense instructive (see claim 8 as issued and the discussion thereon), in that I am wholly unable to believe that during a somewhat acrimonious contest between examiner and solicitor, either party understood what the other was driving at. If discussion left these experts in such a haze, it cannot be said that the file wrapper of Field's patent casts any light on this case.

For the purposes of the record, I formally exclude from evidence the Field file wrapper. It may be considered as rejected, under due exception, and marked for identification. If, however, this should be held ultimately as error, the patent is held to be either inoperative, or so clumsily and blindly specified, as not to constitute a publication within the legal meaning of that word.

2. The Delano system (for Bishop was but a business partner) presents a singular situation. The court is asked to find that in and shortly before May, 1909, and afterwards for a year or less, there was being sold and used in and near a great city (Chicago), an apparatus for lighting motor cars, which absolutely anticipates the present devices of both plaintiff and defendant. Yet Delano, still alive in New York, was not called to describe his own handiwork; further, it was not and could not be denied that, contemporaneously with these acts, now so important, Delano filed an application for a patent (No. 953,584) wholly differing from the system he was selling. Yet when, later in 1909, Bishop tried to introduce a Delano system to the well-known Studebaker Company, his descriptions of what he had for sale are clearly applicable to the system of No. 953,584, a. l as clearly inapplicable to the "perfection lighting system" which is the important thing in this case.

As a prior use, it is my opinion that if Delano, or any one else, were shown within the rule to have made and used what is indicated by the wiring diagram produced by counsel and read by Sellek & Rasmussen, then there was nothing new (except the clutch) in what Leonard did in May, 1909. But it is not proven beyond a reasonable doubt; indeed, personally I do not believe it. The idea was much too good and simple to be lost.

3. The Apple system is proven to the extent of inducing belief in the manufacture and sale of apparatus responding to patents Nos. 965,059 and 968,310, at or before Leonard's date of invention. I have not been concerned to be more precise, because, if the Everett-Bliss devices, which undoubtedly antedate either Apple or Leonard, do not constitute full prior user, the Apple apparatus needs no further consideration.

4. The Everett-Bliss system is, I think, fully described in Defendant's Exhibit 16 (Wray's Bulletin). I am unable to see that the physical exhibit whose performance I watched at the Testing Laboratory

varied, in any way material to this cause,. from what Mr. Wray explained in language suitable to the classroom—an admirable method for purposes of litigation before judges whose youth was nourished rather upon contingent remainders than electro-dynamics.

By means of two pairs of carbon contacts, spring-positioned as to one of each pair, and such one moved against its spring by a floating plunger in a solenoid energized by the generator main current, the resistance in the field circuit is increased, usually little by little, as the r. p. m. increase. The movement is ordinarily by easy gradations. By using two.pairs of contacts, a wide range of step by step regulation is obtained; but, if the r. p. m. are sufficient, the time is sure to come when both carbons show an air gap, which for the current of the moment is an infinite resistance, and all regulation is at an end.

To me the foregoing seems obvious, and prevents the Everett or any similar system of rheostatic graduated control, having for its object (whether attained or not) the maintenance, not of an integrated or averaged current, but as nearly a constant current as mechanical imperfections permit, from being anticipatory of what either plaintiff or defendant are now doing. To put it another way, such a system as Everett's (or Apple's) does not respond to any claim in suit.

The method, hitherto pursued by me, of stating this case, has not emphasized what I think is the vital point, or real position, of the very earnest defense herein. Unless Field is both prior art and intelligible, or Sellek's description of what Delano was not called to explain is to be taken as proved beyond a doubt, the defense really stands on propositions thus put in argument:

"Plaintiff endeavors to cover all vibrating regulators by claims based upon an ordinary or common relay. When plaintiff abandoned the clutch, it abandoned its relay, and then made a regulator that was radically distinguished therefrom. The Everett regulator is a vibratory regulator; the movable contact vibrates rapidly and continuously. Defendant's regulator operates in precisely the same way as the Everett regulator," though "the movement (of defendant's device) is extremely small, not over $1/1000$th of an inch; the armature seems to just tremble backwards and forwards."

While plaintiff's invention, as now defined in claims, is based on new matter put into the specification by amendment of February 15, 1912, and relating to a "widely pulsating current," something not supported by oath and therefore vitiating the patent.

These quotations from briefs may, I think, be reduced to these heads:

(1) Both Everett and defendant have vibratory regulators and pulsatory currents. Everett is older than Leonard; therefore defendant cannot infringe.

(2) Leonard in 1909 invented nothing but control by varying generator speed through his magnetic clutch; anything more than this was sneaked into the specification by amendment without oath, and after the public exhibition in June, 1912, of the Turbayne system. (Patent No. 1,183,411.)

This summation of defendant's contentions, may be considered with what to.me are typical claims, prominently displayed:

### Method Patent.

2. The method of controlling a work circuit compromising a battery with incandescent lamps in parallel therewith, which consists in increasing the voltage until the current in the work circuit reaches a certain maximum, then reducing the voltage until the current in the work circuit reaches a certain minimum, then increasing the voltage until the maximum condition is reached, and repeating the described cycle of operation *in accordance with the amperes in the work circuit* thereby maintaining a substantially constant average current in the total work circuit.

4. The method of controlling the energy delivered by a dynamo armature *to a work circuit across which are* connected a storage battery and incandescent lamp in parallel with each other, which consists in rapidly moving a circuit controlling element *to two* definite different positions alternately in response to changes in the energy supplied from the armature to the work circuit, whereby *rhythmic fluctuations of the energy* in the circuit are produced.

### Apparatus Patent.

8. In a dynamo lighting system for a gasolene motor car, a dynamo adapted to be driven by power derived from the gasolene engine, a storage battery of substantially fixed counter-electromotive force and low ohmic resistance connected in a circuit including said battery and the armature of said dynamo a magnetic coil in series with said dynamo armature and said battery, a *vibratory switch* element adapted to be rapidly vibrated between two *definite* positions, a spring tending to move said switch element to its closed position and the magnetic pull of said magnet being adapted to move said element to its open position and *means dependent upon the to and fro movement* of said element for fluctuating the current output of said armature *whereby* when the speed of said engine *exceeds a certain amount said element is automatically and rapidly vibrated to cause a rapidly fluctuating charging current.*

9. In a lighting system for a motor car having a gasolene engine as the source of motive power, a dynamo adapted to be driven by said engine, a storage battery of substantially fixed counter-electromotive force and low internal resistance connected in a circuit including the armature of said dynamo, and *electro-responsive means responsive to the charging current* supplied by said armature for *causing* the production by said armature of a *rapidly fluctuating charging current which integrates to a substantially constant average current*, said means comprising a vibratory switch element *rapidly and positively moved in one direction* in response to maximum current to reduce the current, *and rapidly and positively moved in the other direction* to increase the current.

(1) Here there is mention of a "vibratory switch" element to be vibrated between two definite positions; there is also mention of a rapidly fluctuating charging current, which, I take it, is the pulsatory current so often referred to by defendant. The kind of argument now under consideration has long seemed to me especially common in patent causes, and quite misleading. It usually comes from patent owners, who devise a good phrase or catchword to describe a virtue, function, or result of their devices, and then argue as if anything to which such catchword of their own devising can apply must infringe.

Here the process is reversed, and anything vibrating or pulsating before Leonard is thought to avoid him. But Leonard did not, and could

not, patent vibratory switches or regulators per se, nor fluctuating or pulsating currents. His claims cover only certain means, and a method of feeding a storage battery, of which a vibrating switch and a fluctuating current are incidents. The switch is not an element, because it vibrates; it vibrates, because it cuts off and restores the current with such rapidity that it merely shakes—to the eye.

[3, 4] The mere fact that Everett's current pulsates, that his carbons vibrate, that defendant's current and switch element do the same, and even faster or more frequently, is nothing to the point. The inquiry is why and how are these phenomena produced? If they are not accomplished by the same method and means, identity of result will not avoid infringement, any more than it proves infringement in the mere usual case. I think it clear, as stated before, that Everett's means are not defendant's, that defendant's are identical with plaintiff's present product, and this last is the equivalent of, and therefore legally identical with, the thing invented by Leonard in May, 1909.

(2) The file wrapper of the apparatus patent is curious and interesting reading; it undoubtedly shows the growth of an idea. Defendant's contention is, in substance, that the claims which (as is not really denied) read on their devices are what I ventured to call in the Mergenthaler litigation "false claims"; i. e., not truly responsive to and justified by the inventive thought of the specification, read in the light of the prior art.

[5] An invention may be larger than the claims founded on it; so much the worse for the patentee, but neither Commissioner nor court can help him. It may be smaller than the claims, which then ought never to have been granted, and, if granted, must be judicially invalidated. But I know no limit upon an applicant's right to build claims upon his actual invention, and to keep on building them as his own comprehension of his own achievement grows upon him, provided that he first and in his original application described his achievement in terms justifying his largest ultimate claims.

It is immaterial that he did not see all there was in his described means or method when his solicitor first proposed claims. If, however ignorantly (and luckily), he filed a sufficient application, he can obtain any claim justified thereby, even if he thinks of it, first, the day the patent is signed. This file wrapper contains internal evidence that all Mr. Leonard's thought centered at first about his clutch, which was the only new thing he had to make to rig out his own car in June, 1909. But he could not freely and intelligently describe what he had put together, without using words now and always in the specification, and justifying the claims in suit, which basically rest on the fact that the thing he built operates as it does, because it gets current for, and feeds it to, the storage battery in the manner I have called "dipping out."

[6] Finally, the method patent is said to be but a description of the functioning of the apparatus. This abstruse inquiry is here of no practical importance. It seems unnecessary to say more than that there is no substantive difference in the disclosures of the two patents; there is no legal objection to a man's getting both a mechanical and method patent on the same state of facts, and this applicant did not want two

patents; the office insisted on a division, for reasons the logical force of which I have never felt, but the practice is well known.

Personally I am unable to imagine any case in which a man could infringe Leonard's method patent without also infringing the apparatus patent; certainly this is not such a case. The fact that the office action may be illogical cannot invalidate what was done, when it does not injure this defendant, to whom it makes no difference whether he infringes one or two patents by using the same thing.

This opinion is rather a report of proceedings and review of arguments than anything else. It is so purposely, for I assume the cause will go up. I have an assured feeling that Mr. Leonard quite literally stumbled on an idea, the size of which did not occur to him until he changed his style of output in 1911, which was before the 1912 exhibition of Turbayne's apparatus. Yet a man is entitled to all the advantages of stubbing his own toe, if he describes just how he did it.

Let plaintiff be given decree as prayed for, with costs. The operation of injunction and the accounting will be stayed pending appeal, on the giving of suitable security, unless cause be shown contra. My present impression is that security will be ample to assure plaintiff sufficient advantage of this preliminary success.