UNITED CHROMIUM, Inc., v. GENERAL
MOTORS CORPORATION et al.
No. 2284.

District Court, D. Connecticut.
Aug. 8, 1935.

Livingston Gifford, George F. Scull, Gustave R. Thompson, and Newton A. Burgess, all of New York City, for plaintiff.

Drury W. Cooper and Merrell E. Clark, both of New York City, Frank E. Liverance, Jr., of Grand Rapids, Mich., and Harold F. Watson, of New York City, for defendants.

THOMAS, District Judge.

This is the usual bill in equity charging the defendants with infringement of letters patent No. 1,581,188 issued to Colin G. Fink on April 20, 1926, on an application filed December 19, 1925. The patent is for a "Process of Electro-Depositing Chromium and of Preparing Baths Therefor." By various mesne assignments, title to the patent in suit is now vested in the plaintiff.

The proofs show that two of the defendants, viz., the New Departure Manufacturing Company and the Bassick Company, have factories within the district of Connecticut, where they had carried on the chromium plating operations which are alleged to infringe the patent in suit. While there is no relationship between these two defendants, they have been joined as parties defendant, and have not objected to the joinder, but have defended the case on the merits. It is admitted in the answer that the third defendant, General Motors Corporation, owns a majority of the stock of the · New Departure Manufacturing Company and controls and directs its business policies. While General Motors Corporation is not a resident of this district, nevertheless, for the purpose of this suit, New Departure's factory in Bristol, Conn., "has been and continues to be a regular and established place of business in the District of Connecticut for the General Motors Corporation," as admitted in paragraph 4 of the joint answer of the defendants. Therefore, there can be no question but that the acts of New Departure constituting alleged infringements of the patent in suit are really the acts of General Motors. Therefore the same proofs of infringement as to New Departure may be taken as the proofs of infringement as to General Motors. Moreover, the defendant General Motors Corporation, under its license agreement with the defendant Bassick Company, sends its agents into this district to aid and abet the alleged infringement by the defendant Bassick Company. It thus appears that General Motors Corporation was committing the alleged infringing acts within this district, is a proper party defendant to these proceedings, and is bound by the final decree.

The patent in suit was held valid and infringed by this court in a suit by this plaintiff against International Silver Company, and is reported in 53 F.(2d) 390. Upon appeal the decree was affirmed by the Circuit Court of Appeals. 60 F.(2d) 913, 917. Claims 4, 6, 10, 13, 16, and 18 were in suit in the International Silver Case and the same claims are in suit in the case at bar.

The invention described and claimed in the patent in suit relates to electro-plating and more particularly to a process of electro-plating chromium from solutions of chromic acid.

There are two purposes for which chromium may be electro-deposited. One involves what is known as "winning" metal. This means creating metallic chromium which is to be used as such after it has been separated from the surface on which it has been deposited. The other consists of securing to some article a permanent chromium plating. So far as the

Fink patent is concerned, the electrodeposition of chromium may be for either of these purposes.

The invention claimed by the patentee is an improvement in the art of chromium plating. The literature on the subject dates back many years, which fact is set forth by Fink in his specification, page 1, lines 15 to 31, inclusive. Therein the patentee says: "For nearly a century there has appeared in the literature considerable matter in respect to chromium plating, and in that literature the use of chromic acid as an electrolyte, as well as the use of various so-called addition agents has been proposed. Notwithstanding these disclosures, a practical and commercially available process of electroplating chromium has not heretofore been known, nor have any of the attempts to establish the commercial art of electro-depositing chromium ever satisfied the test of actual commercial requirements. What attempts have been made have always given uncertain and unreliable results and have resulted in ultimate failure as a reliable or satisfactory commercial process."

The invention is further described in the specification, page 1, lines 32 to 50, inclusive, in the following manner:

"I pass an electric current (from an anode to a cathode, the latter serving as the object on which the metal is to be deposited) through a suitable chromium-carrying electrolytic solution, in the presence of a catalyst. The Catalyst is, as usual, a bystander which does not enter into the electro-chemical decomposition. The chromium-carrying electrolyte which I have found suitable for my process, is a solution of chromic acid, its degree of concentration as regards baths of commercial interest ranging from about 150 grams per litre to saturation.

"The catalytic agent which I use is one having an acid radical which is stable in the bath and which remains stable under the actions which occur in the process when the current is passed through the bath. This catalytic agent is one which performs its action at the cathode."

Among the acid radicals proposed by the patentee is an acid having a sulphate radical which is represented by the chemical symbol $SO_4$. S stands for sulphur; O for oxygen; and the $SO_4$ is the sulphate radical which is the catalyst of the patent.

The patent discloses and emphasizes five rules essential to a continuous and commercial operation and asserts that the application of these rules transformed the art of small and impractical laboratory experiments into a continuous, practical, and commercially successful chromium plating process. After all his experimentation, Fink established the following rules which are set forth in his specification:

"(1) In preparing the electrolyte all of the stable radicals (e. g. $SO_4$) must be computed whether originally in the chromic acid, in the catalytic agent, or otherwise entering the bath.

"(2) The amount of stable radicals (catalytic agent) in the bath should approximate 2.5 grams—be not less than 1 gram and not exceed 5 grams of sulphate radical per liter of a solution containing 250 grams per liter of chromic acid.

"(3) The quantity of the catalytic agent should be regulated within said limits for continuous operation.

"(4) By adding to or subtracting from the quantity of catalytic agent (stable radicals) already present in the chromic acid solution the necessary amount to bring the total amount up to or down to the given limits.

"(5) For temperatures of 15° C to 40° C the proper film is obtained with current densities from ¼ to 1 ampere per square inch."

Prior to the discovery of these rules by Prof. Fink, no commercial plating was successful, but the evidence conclusively shows that if these rules are followed, there will then result a practical, reliable, and commercially available and successful process of electro-depositing chromium from chromic acid solutions and a reliable and commercially adaptable method of preparing the chromic acid electrolyte. The formulation of these rules was original with the patentee.

The defenses relied upon by the defendants are as follows:

1. Invalidity of the claims in suit because, defendants assert, "two of the four groups of catalysts which those claims purport to cover are admittedly inoperative to produce the intended results."

2. The process described in the patent in suit was practiced by others more than two years prior to the date of the application which resulted in the grant of the patent.

3. Noninfringement.

■ The first defense is based on the admitted fact that neither the phosphate nor the borate radicals mentioned in the Fink patent can be used alone in the bath. However, the proofs show that each has some catalytic effect and that, therefore, they are stable acid radicals which, in the language of the Fink patent, "must be computed" as part of "such agents, whether of one kind or another that are actually in the bath." The Fink patent mentions these radicals as "substances which I find available as catalytic agents and which remain stable," and nowhere says that either of them can be used alone. The Fink patent is neither erroneous nor misleading as to these two groups. At the most, reference to them is surplusage, since the patent names at least one group of catalysts which undeniably are highly efficient. That is sufficient under the law In American Sulphite Pulp Co. v. Howland Falls Pulp Co., 80 F. 395, at page 401, Judge Aldrich, speaking for the Circuit Court of Appeals of the First Circuit, said: "Some of these compositions [named in the patent] stood the test better, made better linings, and did the work more successfully, than others; and as to such as he used, such as he described, and such as those skilled in the art could understand, he is entitled to protection."

In French et al. v. Buckeye Iron & Brass Works, 10 F.(2d) 257, 261, Judge Denison, speaking for the Circuit Court of Appeals of the Sixth Circuit, said: "We do not overlook that the specification sets out an additional particular method and advantage which were perhaps impossible of attainment; but that should not prevent due protection for the results which were accomplished."

There is no merit in the first defense.

For the second defense, defendants rely strongly on the so-called Udy defense and the so-called Manhattan defense, neither of which was presented in the International Silver Case.

■ The so-called Udy defense is based upon the activities at Niagara Falls of Marvin J. Udy, a research chemist in the employ of the Union Carbide & Carbon Research Laboratories, a subsidiary of the Union Carbide & Carbon Company.

The proofs show that Udy was directed to develop a process for the "winning" of chromium from materials containing chromium. He began his experimental research with the Sargent article and for a long time used chromium sulphate in his baths. Like other followers of Sargent, he got results at times, but could not rely on them. Nothing resulted that was commercially useful. He found that chromic acid contained sulphate and he used barium to precipitate it out of the chromic acid. He analyzed his baths, but now admits that his method of analysis gave wrong results, so that he reached the admittedly erroneous conclusion that he could electrolyze a chromic acid solution which was pure or which, at least, was free of any mineral acids. It is not clear when Udy changed his method of analysis and obtained accurate results.

In the fall of 1923, in the course of some experiments with coated anodes, Udy concluded that chromium sulphate was not necessary and that free sulphuric acid could be used instead. From this he developed a method for chromium plating in which he first treated the chromic acid with barium hydroxide as a precipitant for the sulphuric acid present to produce what he thought of as pure chromic acid. Then he added sulphuric acid.

Udy proposed to maintain such a plating bath by addition of his supposedly pure chromic acid produced by his barium precipitation method; and, in his patent application filed in June, 1924, he said that "in this way, the bath may be preserved for months with little or no change in its composition or behavior."

In December, 1923, Udy used his new method in a bath for about two weeks, plating some graphite strips to be used in experimental work by another subsidiary of the Union Carbide & Carbon Company. No adjustments were made to the bath while it was in use except water and the supposedly pure chromic acid. Only one analysis was made and that at the start.

All of Udy's work prior to 1926 was experimental. In connection with it, he produced some chromium metal, the primary object of his research. He also plated articles sent to him from time to time "as test pieces in the experimental development of the solution." Udy's first commercial public work in chromium plating was in May, 1926, at the Metals Protection plant in Cleveland, where a trial installation was made. This was a month after the Fink patent had issued, a year after Fink's commercial chromium plating operation on a large scale at the Center street plant in New York City, and three or four months

after the still larger Waterbury plant had begun operations.

Shortly after the Fink patent issued in April, 1926, Udy's patent application, filed in June, 1924, was amended by inserting certain expressions found in the Fink patent and by copying a number of the Fink claims. An interference was declared. While this interference was pending, the company then owning the Fink patent and the company owning the Udy application consolidated all their respective interests in chromium plating, including the Fink patent and the Udy application, in the present plaintiff. Under the Patent Office rules, the interference could not be continued because of the common ownership of the patent and the application, and it was necessary for the plaintiff to decide the question of priority since the Patent Office examiner, over the objection of Fink, had held that Udy could make Fink's claims. The matter was placed in the hands of two reputable attorneys. Udy's then patent solicitor wrote to his Washington associate to get an extension of time in the interference because "it is going to require a good deal of work on our part to determine which party is entitled to the patent." About six months after plaintiff became the owner of the patent and application, on the advice of these two attorneys, Udy was asked to file a concession of priority. This he did but under protest. The Udy application was prosecuted further in an effort to get some specific claims but was then abandoned.

Defendants argue that this concession was filed in bad faith, but the circumstances fail to support such a charge. Indeed, it would have been to the plaintiff's advantage to have had a patent issue on the Udy application, if it had disclosed the Fink invention, since thereby the monopoly would have been extended at least two years or more and there would have been an advantage in Udy's earlier filing date. No rights of the respective inventors were involved since each had assigned his rights. Garfield et al. v. Western Electric Co., Inc., et al. (D. C.) 298 F. 659.

The situation here is similar to that in United Shirt & Collar Co. et al. v. Beattie et al., 149 F. 736, 741, in which Judge Coxe, speaking for the Circuit Court of Appeals for the Second Circuit, said: "The question is at best a technical abstraction. No rights of rival inventors are involved, as the complainant, the Shirt & Collar Company, was assignee of both Pine and Dor-mandy, and that company, with full knowledge of the facts, took the patent, in accordance with what appeared to them to be the truth, in the name of Pine. A decision against Pine now will benefit infringers but will be no benefit to Dormandy."

Similarly, in the case at bar, the invention of the patent in suit belonged to the plaintiff no matter which of its two assignors had invented it. The public interest was not involved, unless there was a prolongation of the monopoly; and that is not present here, because of plaintiff's reliance on the Fink patent which had already run for nearly two years when Udy's concession was filed.

Unless it is very clear that plaintiff's counsel made a legal mistake in advising the abandonment of the Udy application, then the Fink patent should not be invalidated. Such a ruling would only benefit infringers and would mean the loss to plaintiff of the fruits of the experimental work of its predecessors in title which resulted in the commercial process of chromium plating now so generally used.

 While Udy wrote periodical confidential reports of his research, none of them was ever made public, certainly not until long after Fink's large scale operations had been begun. A number of copies of each report was made, of which Udy kept one, another was kept in the research files at Niagara Falls, and the others were sent to the New York office of his employer. There is no proof that any one ever read any particular one of these reports. Becket, one of Udy's superiors, says he read a good many of the weekly reports generally and even a larger number of the monthly reports, but it does not appear that he ever read the particular reports on which defendants rely. Critchett, another superior, says that, while he was generally in touch with Udy's work, his knowledge did not extend to actual details. Beckett says that "knowledge of the research work which Mr. Udy did was kept within the organization." The abandoned Udy application was a confidential communication and was not a part of the prior art. Vacuum Engineering Co. v. Dunn (C. C. A.) 209 F. 219; H. Ward Leonard, Inc., v. Maxwell Motor Sales Co. (D. C.) 288 F. 62, 67; Walker on Patents § 82. There is no proof that any one ever saw any of Udy's baths in operation and, even if they did, the nature of the process in use obviously would not be apparent.

Clearly, Udy's writings per se have no evidential value to support a defense. They were not publications. Like an application for a patent, they were confidential writings which were kept secret and inaccessible to the public. Udy did not thereby add "anything to the sum of human knowledge." H. Ward Leonard, Inc., v. Maxwell, supra.

Even if Udy had invented the process of the Fink patent before Fink, such knowledge and use by Udy, under the circumstances as presented here, would not constitute a legal anticipation of Fink. In order to anticipate, such knowledge and use must have been accessible to the public, whereas all of Udy's knowledge and doings were kept secret.

After referring to the statutory defense that the patentee "was not the original and first inventor or discoverer * * * of the thing patented," the Supreme Court of the United States, in Alexander Milburn Co. v. Davis-Bournonville Co., 270 U. S. 390, at page 400, 46 S. Ct. 324, 70 L. Ed. 651, opinion by Mr. Justice Holmes, said: "Taking these words in their natural sense as they would be read by the common man, obviously one is not the first inventor if, as was the case here, somebody else has made a complete and adequate description of the thing claimed before the earliest moment to which the alleged inventor can carry his invention back. But the words cannot be taken quite so simply. In view of the gain to the public that the patent laws mean to secure we assume for purposes of decision that it would have been no bar to Whitford's patent if Clifford had written out his prior description and kept it in his portfolio uncommunicated to anyone."

Also in Charles J. Gayler and Leonard Brown, Plaintiffs in Error, v. Benjamin G. Wilder, 10 How. (51 U. S.) 477, at page 497, 13 L. Ed. 504, the Supreme Court, speaking by Mr Chief Justice Taney, said: "By knowledge and use the legislature meant knowledge and use existing in a manner accessible to the public."

With reference to the same subject-matter, Judge Townsend, in Matheson v. Campbell (C. C.) 69 F. 597, at page 604, said:

"The consideration received from the disclosure of the discovery to the public is the foundation of the right to the monopoly of the patent. As against an original discoverer, the law recognizes no distinc-

tion between the lost art, the abandoned experiment, and the secret process. Whether the conception slumbers buried in the ashes of the past, lies inchoate in the brain of the would-be inventor, or is locked in the breast of its creator, it cannot afterwards be dug up, developed, or set free, to question the title of the complete creation first brought forth into the world of knowledge, and thus, as the first born, the rightful heir to the patent estate. As against an original inventor, anticipation is not shown by prior use of the invention under conditions which fail to disclose its composition or operation. Such knowledge of the invention should be accessible to the public. In Boyd v. Cherry [C. C.] 50 F. 279, 283, Judge McCrary says:

" 'If the alleged prior use of the process was under such circumstances that the public obtained no knowledge of the mode of its operation, or of the results to be obtained by it, there is no prior use, within the meaning of the patent law. If kept secret by the first inventor until the second has discovered it and given it to the public, the latter will be protected, for it is to him that the public is indebted; it is from him that the public has received value.' 3 Rob. Pat. 152."

In Pyrene Mfg. Co. v. Boyce et al., 292 F. 480, at page 485, Judge Woolley, speaking for the Circuit Court of Appeals for the Third Circuit, said: "In considering the several alleged prior uses set up by the respondent, we do not find that, within the authority of Gayler v. Wilder, 10 How. 477, 13 L. Ed. 504, they were 'so far understood and practiced or persisted in as to become an established fact, accessible to the public and contributing definitely to the sum of human knowledge.' "

It appears from the evidence and is clearly shown that all of Udy's writings and doings were, in the language of the decisions above cited, "confidential" and "private communications" and were "kept secret," and were never "accessible to the public," and they never "added to the sum of human knowledge." Consequently, they do not constitute a defense of prior knowledge and use, nor are they part of the prior art. Defendant, however, cites and relies upon Corona Cord Tire Co. v. Dovan Chemical Co., 276 U. S. 358, 48 S. Ct. 380, 383, 72 L. Ed. 610, but as I read the case it is not in conflict with the conclusion here reached. As Mr. Chief Justice Taft said, the invention there could be express-

ed in one sentence, "I claim the use of D. P. G. as an accelerator, because I was the first person who observed its efficacy for that purpose." The mere statement of this to any one would disclose the entire invention. Kratz, held to be a prior inventor, had tested D. P. G. as an accelerator and this work "was known to and participated in" by Kratz' associate, the chief chemist of his employer, who corroborated Kratz' testimony. Kratz also read a paper on his discovery at the Philadelphia meeting of the American Chemical Society entitled, "The Action of Certain Organic Accelerators in the Vulcanization of Rubber," which was a review of the comparative excellence of a number of well-known and used accelerators. This fact clearly shows that Kratz' discovery was not "secret," but was "accessible" to the public. In Brush v. Condit, 132 U. S. 39, 10 S. Ct. 1, 4, 33 L. Ed. 251, the prior use was "the public, well-known, practical use, in ordinary work" of an electric lamp "in the presence of the employees of the factory." In each of the cases of Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821, Reed v. Cutter, 1 Story, 590, 599, Fed. Cas. No. 11,645, and Concrete Mixing & Conveying Co. v. R. C. Storrie & Co. (C. C. A.) 27 F.(2d) 838, 840, affirmed 282 U. S. 175, 51 S. Ct. 95, 75 L. Ed. 278, all cited by defendants, the facts indicate that the anticipating prior use was open and accessible to the public and known to many persons. Furthermore, the Udy process, which is described in his abandoned application, does not anticipate the Fink invention nor did Udy practice the Fink invention.

The Fink patent discloses a practical, reliable, and commercially available method for chromium plating continuously and with certainty. By it, as the Circuit Court of Appeals said in the International Silver Case, "for the first time the art could turn out chromium plating with certainty," and I add what I regard as important, the further element of commercial plating with certainty. It is Professor Stevenson's uncontradicted testimony that the Udy process "would fail commercially." This is true because the Udy process does not take into account the possible presence of acid radical catalysts other than $SO_4$ and because no additions are made to the bath in continuous operation except water and supposedly pure chromic acid. To obtain this, Udy proposed and used barium hydroxide to precipitate the sulphate in the commercial chromic acid. But this would not remove any other acid radical catalysts in the acid and, even as to the sulphate, the results are admittedly uncertain. Either some barium or some sulphate would remain in the acid. All this would upset Udy's idea of maintenance of the bath by the mere addition of chromic acid. Nor would such additions take care of bath variations arising from drag in, drag out, and spray losses.

Therefore, I conclude and find that the Udy process is uncertain, unreliable, and not a practical, reliable, and commercially available method. It has never been used commercially, and Udy himself in his first public work in 1926 at the Metals Protection plant dropped the barium precipitation step and maintained the bath just as Fink does. His two weeks' operation of a bath in the research laboratory in December, 1923, in which no additions were made except of chromic acid and water, was not sufficiently long to show that the Udy process would satisfy actual commercial requirements and was not the practicing of the Fink invention.

Defendants assert that plaintiff has willfully attempted to conceal this so-called Udy defense and because of this ask that all relief be denied. The facts do not support defendants' assertion. None of the steps taken in the Patent Office were unusual. The existence of the Udy abandoned application would be apparent to any one investigating the Fink file wrapper. No attempt was made to silence Udy even by retaining him in the employ of the Union Carbide & Carbon Company which owns a relatively small part of plaintiff's stock. When he was discharged from that employ, Udy was permitted to carry away with him a full set of his reports, though he had expressed his resentment when he signed his confession of priority.

Udy's experiments and Udy's application did not negative novelty because they did not meet Fink's claims. His experiments did not negative invention, because they never satisfied the requirements of the prior state of the art. His application did not negative invention because it never satisfied the requirements of the prior art, and because the process described by it did not correspond with Fink's, either in mode of operation or result.

I, therefore, conclude that the Udy defense is not sufficient to invalidate the Fink patent in suit.

The so-called Manhattan defense is based on the activities of the laboratory workers of the Manhattan Electrical Supply Company at its Jersey City plant. Late in 1923, they began experimenting with the chromium plating of tools for some experimental work on dry batteries and continued that work into 1926.

The evidence shows that, like the Bureau of Standards, in the language of the Circuit Court of Appeals in the International Case, the Manhattan workers "often got good results; it is equally plain that they did not know on what those results depended and could not rely upon producing them."

Starting with the Sargent article, the Manhattan workers conceived the idea that the bath should have more trivalent chromium than would be derived from the chromium sulphate of the Sargent article, or, as they expressed it at that time, more trivalent chromium "than is theoretically required to combine with the $SO_4$ radical present" to form chromium sulphate. They were thinking in terms of chromium sulphate in the bath. They considered the radical, not as the important element to be controlled in relation to the chromic acid in the bath, but merely as the thing by which to measure the relative amount of trivalent chromium in the bath.

Although the Manhattan baths were analyzed at irregular times for chromic acid, trivalent chromium and sulphate, there is nothing in the Manhattan records to indicate that the analysis for sulphate was for any purpose other than as a measure of the amount of trivalent chromium above that which would combine with the sulphate to form chromium sulphate. Many of the analyses show wide departures from the amount specified in the Manhattan "formula" and yet nothing was done to regulate the sulphate content of such baths. In contrast, there were frequent treatments of the bath with methyl alcohol to increase the trivalent chromium content when trouble developed in the plating.

In July, 1924, and therefore after Fink's date of invention, additions of chromium sulphate and of sulphuric acid were made to one of the Manhattan baths which had been producing bad plating from the first. Defendants urge this as proof that the Manhattan workers appreciated the importance of the acid radical. But the circumstances surrounding these additions, especially in the light of the subsequent history of this and other baths, contradicts this. When trouble in plating developed, there were repeated treatments of the bath with methyl alcohol and then a series of tests were made to determine what amount of trivalent chromium would give the best results. In these tests the sulphate radical content varied greatly, but no attention was paid to that. Instead, the bath was given frequent treatments with methyl alcohol. Then some chromium sulphate was added to the bath and, later, several additions of sulphuric acid. Because of the absence in the laboratory records of the dates when the results of analyses were received, there is no proof that these additions were induced by the results of the analyses and some of them were clearly made independently of analysis. The recollection of the Manhattan workers as to these events, given ten years after the event, cannot be relied on, especially since they now have the present-day knowledge of the essential thing in chromium plating.

That there was no thought of restoring the sulphate radical to the amount required by the original "formula" is evidenced by the many additions which were made in such a short period and which finally brought the sulphate content up to nearly three times the amount called for by the "formula." Thereafter, no further additions or subtractions were made, though the sulphate content continued greatly in excess of the "formula," sometimes exceeding Fink's limits, as now calculated. Obviously, the Manhattan workers were floundering. Such additions of chromium sulphate and sulphuric acid as they made were like their additions of methyl alcohol, just to see what the effect would be, without appreciation of the essential chromic acid—acid radical ratio of the Fink invention or that the radical alone was important.

This conclusion is in accord with what the Manhattan workers did in the first half of 1925, more than a year after their experimenting began. A new bath was made up which gave "dark" plate from the beginning. Yet no analysis was made for five weeks and then the sulphate content was double that of the Manhattan "formula." Three weeks later, without further analysis, chromium sulphate was added at intervals of a few days. At that time, its sulphate content was three times that of the "formula." It is admitted that the additions were made to this bath to "try and

see if an increase of chromium sulphate would remedy the trouble." The Manhattan workers, even at that late date, were thinking in terms of chromium sulphate, and their repeated additions of it, when the sulphate radical content was already double that of their "formula," emphasize the fact that they had not caught the essential idea and were groping in the dark.

During the period of the Manhattan experimentation, there were other baths, which were made up and which were discarded because, apparently, the Manhattan workers did not know how to correct them. In other baths, the sulphate radical content was allowed to wander haphazardly and often outside Fink's limits, without any attempt to correct it. In still other baths, the sulphate content remained fairly constant, not because of any regulation, but apparently fortuitously.

In these respects, the Manhattan history is like that of the Westinghouse Company. As the Circuit Court of Appeals said in the International Silver Case, supra, the Westinghouse Company also had "a number of baths in which the chromic sulphate and radical were within Fink's formula." But in December of 1925, the Westinghouse Company, just like the Manhattan workers, had "baths in which both the chromic sulphate and the radical ran well above his [Fink's] maximum."

On the entire history of the Westinghouse experimentation, the Circuit Court of Appeals concluded that "the proof is too uncertain that they had even established any limits to the ratio in terms of the sulphate; it certainly does not disclose the idea that the radical alone was important." Therefore, it follows that a consideration of the entire history of Manhattan leads to the same conclusion as was reached in the Westinghouse defense.

All of the proofs in the International case as to the alleged prior use by Westinghouse and Eastman have been incorporated in this case by stipulation and nothing has been added to them in this trial. The Circuit Court of Appeals held that these alleged prior uses did not anticipate and it is so held here. Nor do I find anything in the prior art patents or publications which can possibly be held to anticipate the Fink invention. The pertinent ones were discussed and decided by this court and the Circuit Court of Appeals in the International Silver Case and it will serve no useful purpose to rehearse them

here. For the reasons herein given, these various defenses fail.

■ The charge of infringement is based on the process used by the defendants New Departure and Bassick at their factories in Bristol and Bridgeport in this district. As pointed out, supra, the defendant General Motors admits that it owns the majority of New Departure stock, that it controls and directs New Departure's policies in business, and that the New Departure plant is a regular and established place of business of General Motors in this district. Under these facts, infringements in this district by its subsidiary, New Departure, are infringements by the defendant General Motors. Industrial Research Corp. v. General Motors Corp. (D. C.) 29 F.(2d) 623; Detroit Motor Appliance Co. v. General Motors Corp. (D. C.) 5 F. Supp. 27.

Moreover, General Motors, pursuant to a license agreement with the defendant Bassick, sent its employee to the Bassick plant and in that factory set up and put in operation the first chromium plating bath used by Bassick and instructed the Bassick employees how to carry on the process which Bassick used. Consequently, General Motors is also a contributing infringer in this district if the Bassick process infringes. There is no material difference between the processes used by Bassick and by New Departure and they will be considered as one and the same thing and as defendants' process.

The plating operations, in defendants' process, are continuous and successful. The article to be plated is the cathode. The bath temperatures, the current density, and the free evolution of hydrogen at the cathode are the same as in the process found to infringe in the International Silver Case.

Defendants' baths were made up of chromic acid and chromium sulphate. After being made up, they were analyzed and adjusted on the basis of such analyses. In operation, frequent analyses for chromic acid and $SO_4$ were made and the baths adjusted on the bases of such analyses. In adjusting for the $SO_4$, sometimes chromium sulphate was used and sometimes sulphuric acid. One of the Bassick employees testified that after the determination of the total sulphates, he added either chromium sulphate or sulphuric acid "to bring up the concentration of total $SO_4$ to the same proportions as given in the original concentration in the old bath

* * * heed being paid to the difference in sulphate contained in either chromium sulphate or sulphuric acid." In all cases, both in the original make-up and in the subsequent adjustments, the ratio of chromic acid to $SO_4$ was approximately Fink's optimum.

Defendants see to it that the chromic acid they use is as free from other acid radicals as possible. General Motors' specifications for chromium plating chromic acid to be supplied to its subsidiaries limits the "sulphate ($SO_4$) to 25%" and "chlorine (Cl) none" and the agreed samples typical of that used by defendants come within these limits.

Present day suppliers of commercial chromic acid for chromium plating furnish such acid of very high purity. Defendants' expert admits that it was the use in chromium plating which induced the demand for and the supply of chromic acid free from other acid radicals. In 1928, one of the suppliers of chromic acid stated in its advertisement that "in the light of present knowledge it is quite evident that many of the baffling failures in Chrome plating in the past were due to impurities, some of which need only to be present in minute traces to cause disastrous results." In contrast, prior to the Fink invention, there were instances of so-called "C. P." chromic acid containing 3 per cent. or more of $SO_4$.

Defendants assert that they do not infringe because they are "following Sargent." Since the proofs here, as well as in the International Silver Case, show that Sargent's "followers never could depend upon his process" and defendants' process is admittedly dependable, it follows that defendants must be doing something which Sargent did not teach. Clearly it appears that defendants are controlling the acid radical catalysts of the bath as taught by Fink and as Sargent did not teach.

Defendants further assert that their insistence on chromic acid with very low acid radical content is in accord with what a Westinghouse experimenter did and which was referred to by the Circuit Court of Appeals in the International Silver Case as showing that this experimenter "had not grasped the critical facts." It is doubtful whether the unsupported testimony of one witness as to the alleged Westinghouse return of impure chromic acid is sufficient proof. This alleged practise certainly did not occur until September, 1924, several months after Fink's date of invention and therefore was not in the prior art. In any event, the Circuit Court of Appeals in the International Silver Case did not distinguish the Fink invention from the Westinghouse experiments merely because of this alleged insistence on having pure chromic acid. If it had, the defendant in the International Silver Case would not have been held to be an infringer, because that defendant also specified that "the sulphate content" of its chromic acid "shall not exceed 1/10 of 1 per cent."

It is clear that defendants, as well as the chromium plating art generally, now know "the critical facts" and therefore use chromic acid as low in other acid radicals as possible, so that additions to the baths will have a minimum disturbing effect on the acid catalyst content.

Defendants also assert that, starting their baths with chromium sulphate, they maintain them by controlling the chromium sulphate and not the $SO_4$. While they do use chromium sulphate as a bath addition, it is clear that they use it merely as a source of $SO_4$. That they sometimes use sulphuric acid instead of chromium sulphate shows this. In determining the amount of either chromium sulphate or sulphuric acid to be added, defendants utilize only the $SO_4$ content of the analyzed bath as compared with its original $SO_4$ content. While they calculate the amount of chromium sulphate which would contain the amount of $SO_4$ present in the bath, the witnesses are in agreement that that does not determine the amount of chromium sulphate actually in the bath. Because of the presence of other substances with which the $SO_4$ might combine, it becomes, as one witness testified, "quite a matter of speculation" to assign the $SO_4$ among these different substances. Defendants' procedure is certainly quite different from that of the early Westinghouse chemist who really was attempting to determine the amount of chromium sulphate in his baths when the Westinghouse experimenters thought their chromium sulphate was the important thing.

Following the teachings of Fink, and not Sargent, defendants analyze for the acid radical and base all their calculations for adjustment and maintenance on their radicals alone. When they do convert the $SO_4$ determination into chromium sulphate, they are doing an idle thing and

merely speculating as to what might be the chromium sulphate content of the bath. What they really do is to keep "an eye on the radicals in the solution."

It must be held therefore that defendants' process infringes the Fink claims 4, 6, 10, 13, 16, and 18 in suit. For instance, referring to claim 13, defendants carry on their chromium plating operations by plating on a cathode from a chromic acid solution in the presence of a hydrogen film and use the sulphate radical catalyst in an amount less than 5 grams per liter to 250 grams chromic acid. Referring to claim 16, defendants analyze the new baths prepared by dissolving commercial chromic acid, and then adjust the baths so that the total amount of catalytic radicals present is less than 5 grams per liter of solution containing 250 grams of chromic acid.

It follows therefore that there may be a decree for the plaintiff adjudging the patent in suit valid and infringed, an injunction, a reference to a master, and an accounting of profits and damages. Submit decree accordingly properly consented to as to form.